Chase number 14-1158, 14-1172 and 14-1276. The name is Morgan Chase Bank, and I'm Larry Winget Living Trust. I'm here to present the case. I'm here to present the case. I'm here to present the case. I'm here to present the case. I'm here to present the case. The Police of the Court, Your Honor. My name is Mel Washburn, and I represent Chase. I'm going to speak for 11 minutes, and then I've reserved 2 minutes for rebuttal at the end of the proceedings here. Today I want to address the principal issue of our appeal, which is the issue of reformation. And I want to bring to the Court's attention in particular, I mean, we made many arguments and all of them are valid, but I want to bring to the Court's attention in particular what I feel is our core argument, the core of our case. And that is this. To have reformation, you have to find mutual mistake. That is, both parties have to be mistaken. And the evidence shows that Chase did not make a mistake. And in fact, if you read through the judge's opinion, he never identifies what the mistake was that Chase made, who made it, and when they made it. And the reason for that is that the lawyer who was drafting the guarantee, and she was not on behalf of Chase, not only drafting the guarantee, but also drafting all of the other ancillary documents, all of the many guarantees and pledges and so on that were to support the Eighth Amendment. She testified at the trial that she intended for the guarantee to be full recourse as to the trust. That when she added the trust to the guarantee, and the way that she added it, she understood and intended that the recourse to the trust would be full recourse. That's what she said on the stand. Did Judge Cohen find that testimony incredible? He did not. He found two witnesses incredible, Mr. Shield and Mr. Burgess, both of whom were senior attorneys at Dickinson-Wright, and neither of whom was directly involved in either supervising Dawn, Ms. Faxon-Singer, or in drafting the guarantee. You're saying there is no finding of fact as to credibility as to that testimony? Exactly, Your Honor. Exactly. And similarly, there are eight drafts. After she added the trust to the guarantee, there are eight drafts. Those drafts were circulated, as was the practice for all of the documents that were redrafted at that time. They were circulated to the lawyers at the other side, but if you look at them, I'm sure this is in our briefs, if you look at the email circulation list, it's very long. It includes all the people at Dickinson-Wright and all the people at the bank, and most importantly, it includes Linda Thompson and Richard Babcock, who were the two bankers who were leading the Chase team in this workout effort at that time. And so they reviewed every one of those eight drafts, and the first draft had all the language relating to the trust in black letter. Now, none of them ever said to Ms. Singer, nobody ever said, Ms. Singer made a mistake. And in fact, though Ms. Thompson could not recall, and it's no surprise, that particular guarantee among all the many guarantees that had been drafted, she said, in general, our intent was to get everything that we could. Let me just ask you a question. Maybe this is not even relevant. You started your argument about whether there's a mutual mistake. Does it make a difference as to whether it's a mutual mistake of fact or a mutual mistake of contract terms? No, there has to be a mutual mistake either as to the facts or to the legal effect. Because the Michigan courts seem to be a little divided in terms of how they view those two issues. I agree, and as I read the cases, it can be either one, but ordinarily it's the legal effect of what's… That's the key to this case, that this is a diversity case under Michigan law. Correct. Our role as a federal appellate court is to predict how the Michigan Supreme Court would decide this case. Is that right? Correct. Is that correct? Yes. We can look to the Michigan Court of Appeals decisions. Yes. But we have to predict how the Michigan Supreme Court would do it. We look at their opinions. We look at their philosophy. We look at their approach to contract law, to statutory interpretation. Us from Michigan are very familiar with the conservative nature of the Michigan Supreme Court, that it's a textualist court. It's a Scalia court, both for statutory interpretation and for contract law. And I guess my question is, how does the philosophy and approach of this most conservative court… Some people have said it is the most conservative state Supreme Court in the nation as to statutory interpretation and contract interpretation. I mean, so much so there's a hole in the Michigan Supreme Court that an absurd term in a statute is nevertheless given effect, even if the statutory term is absurd, it is enforced as written. As long as it's not ambiguous, absurd terms in statutes are enforceable. How does that approach impact this case, for us to look at this case when we're doing it as a prediction of how this conservative court would rule? I've always felt, and since we first began litigating this issue years ago, we looked at this issue and thought about it. It's always been our belief, looking at the Michigan court law in general, that they're very conservative approaches, that they're very reluctant to tamper with or amend or reform an agreement that has been signed by both parties who were counseled to a fare-thee-well by adequate lawyers and for whom there's no evidence, as here, that there was actually a firm prior agreement executed by both parties. There's nothing like that in this case. All there is, is the drafting of the document itself. And in those circumstances, the Michigan courts are very reluctant. Their approach is very conservative. They're very reluctant to reform viable contracts, especially between sophisticated parties that have been counseled by lawyers. Certainly, go ahead. I'm sorry, I don't get to run things. Assume for the moment that we find that there was not clearly erroneous for Judge Cohn to find by clear and satisfactory evidence. In my understanding, that's a synonym for clear and convincing evidence. What do we find? He got the factual findings, or at least they're supportable. Isn't then our decision pretty much done because reformation is an abuse of discretion? I mean, if we find that there was a mutual mistake of fact, it seems to me that the next question almost answers itself, because that's how else could it be cured. Is there another thing that he could have done that makes what he did do, at the end of his opinion, an abuse of discretion? Or is the real question whether or not his factual findings could be upheld? I think, well, the conclusion that there was a mutual mistake is really a legal conclusion based on the facts that he found, and that's a legal question, whether there was a mutual mistake. My understanding of the law is that the finding of mistake is a factual finding. Correct. That is reviewed on a clearly erroneous standard, not on a de novo standard. My point is, if you look at his factual findings, there's nothing that says, as I said at the beginning, there's nothing that says that Chase made a mistake or what that mistake was. To the extent that there are factual findings, there's nothing in those factual findings that's sufficient to support the legal conclusion that there was a mutual mistake. But my question was, if we disagree with you. If you disagree with me, then it seems to me there's another factual finding that has to be there. There has to be clear evidence of a prior agreement between the parties. My point is, let's assume for the moment that we wind up agreeing with Judge Cone. Right. Now the question is remedy. Right. And the remedy here was reformation. Again, it's my understanding that my question is very simple. If we get to that point where we say, well, was the remedy appropriate, having disagreed with you with everything else, it's my impression that the answer almost answers itself, yes. I'm inclined to agree. Okay. Yes, I'm sorry I didn't. No problem. I'm inclined to agree. No, I'm sorry. Yes. We're not suggesting there ought to be some other remedy. Okay, so I was talking about Dawn Singer, Linda Thompson, and also Roy Gallagher, the chief financial advisor for the bank at that time. He was a manager at Ernst & Young. He also testified that the lenders were trying to obtain everything that they could in these agreements to support that loan. So there's no testimony, no evidence that people at Chase, either Ms. Singer, the lawyer who was drafting the documents, or the bankers who were running the case, or the financial advisor who was advising them, intended to limit in any way their recovery against the trust. Do we look at the intent or do we look at what they did? Then look at what they did. That's kind of the difference, isn't it, in the philosophy of statutory construction and contract construction. The liberals want to say, well, what was the intent of the statute, while the conservatives, the Scalia-Michigan Supreme Court majority would say, no, what did they say? Words mean what they say. They're textualists. What does the text say? Isn't that really the key here? Judge Cohen doesn't subscribe to that philosophy. He is the intent side of it. In fact, he's criticized the Michigan Supreme Court for their approach. He thinks it's simplistic. But anyway, it is the law of the state of Michigan, and that's what he has to follow. Isn't that really the key here is the difference in philosophies? I agree that's right. Judge Cohen, when he talks, he always talks about the intent of the parties. He looks at what they actually did and tries to discern an intent behind that. Under Michigan law, you wouldn't do that. What they did is maybe not what they intended. How would the Michigan Supreme Court rule on that? The only way the Michigan Supreme Court would say what they did doesn't matter is if there was a prior firm agreement that you could reform back to. But even then, you have to find mutual mistake, and if what they did wasn't a mistake, then that's as far as you get. So I agree that, and I actually almost apologize for using the word, we got carried away in intent at the court below, but what really counts is what did they do, and is there any evidence that that was a mistake, that that was contrary to some prior agreement? And there is no such evidence because there's no prior agreement. All there is is a term sheet that says at the bottom, this is an outline only, and it's signed by only one party, Mr. Wynja. That's not a prior agreement. So on both the legs of reformation, the facts simply do not support what Judge Cohen has done. And the proper remedy is to enforce the contract as it was written, and that's all we're asking for. I'm looking at finding paragraph 22 of his findings on page 17. It refers to Faxon Singer's testimony. Is that the Don, the singer you're referring to? Yes. I'm sorry, what page are you? It's page 17, Judge Cohen's opinion. Okay, I'm good. I'm here. Yeah, take a moment. Okay. I mean, my question really simply is, he refers to Faxon Singer. I assume that's the same singer you're referring to. Yes. And according to him, her testimony and McKee's testimony, and if I read correctly, he only recites McKee's testimony about wanting to be certain that they've got the actual owner of the stock put in there so that they won't have a problem in the case of default, because Ms. Wingate says, well, sure, here you are, but I don't own it. And is that a misreading or misstatement as to her testimony in that regard? Well, clearly it's a finding of fact by him. And secondly, she did say that originally the situation basically was the trust was never mentioned by Mr. Wingate and the trust side at all. The trust was never mentioned until they were well into the drafting period. And the lawyers representing Mr. Wingate said to Ms. Faxon Singer, you know, there's this trust out there, and it may own some of the assets that are being pledged in this guarantee. And that was all they told her about it. They didn't tell her what the trust might own or might not own or anything like that. And she and the partner that she was working with, David Morrow, said, well, okay, then the trust has to become a guarantor as well. It's got to be added to the guarantee. And the thing is that what Ms. Faxon Singer then did, which was to add the trust and add full recourse against the trust, is not inconsistent with what he says in paragraph 22. Right, yeah, it's not inconsistent. I mean, that's key. We want to be sure that all of the assets that are being pledged here are being pledged by the people who actually own them. And you can't tell me what the trust owns. We put the trust in as a full recourse guarantor. After the trust was added as an unlimited guarantor, there were eight other drafts that were changed between the attorneys. Were those all just technical edits, or were any of them substantive? There were substantive changes in those. In fact, there were changes to the very sentence in which the trust was added. An additional language was added in there to make the Section 3 as we have it now that talked about the steps that would have to go through to collect against Mr. Wynja. And as we mentioned in our briefs, during the course of the drafting, there was also initially none of the pledged entities would be allowed to make any borrowings. For the obvious reason that if they borrowed, that those borrowings would prime, would come ahead of. So we've got collateral here. Ultimately, through negotiations and by the proposals of Mr. Wynja's attorneys, $33 million in borrowing power was put into the guarantee, into the pledges to allow those companies to prime the bank by $33 million. And also another thing was, as you know, very important in this was ultimately the Australian and South African entities which were owned through several steps of ownership, through PIM and VENCO, back to the trust. They were very important because they were operating, functioning companies with additional strength and financial resources for the enterprise as a whole. They were, initially, they were 100% and the term sheet says 100% of their value is going to be pledged. That was bargained out at 65%. You say bargained out. Is this by different drafts? Yeah, well, it's actually one draft. In one of the drafts, any draft, as Dawn testified and as Mr. McKee said, any draft would be sent to the other side. Then they would send back written comments and there would also be a long telephone call and so on and so forth. Your position, apparently, the drafts are negotiation, the negotiation position, and they would counter with another position and go back and forth. So the terms of the agreement are like a moving target until they're finally executed. And they'd like to take the position, no, the intent of the parties was way in the beginning and all we're doing is writing down the terms and we're doing this as a technical matter or something like that. Yeah, the mere scriveners. You're saying the negotiations are continuing throughout the drafting process. There's no question. Anybody who looks at those drafts, they're black-lined to a fairly well. You're saying the drafts themselves are a negotiation. That's right. Irrespective of testimony or conversations or letters or extrinsic evidence of, okay, this is your position. Judge Cohen said, no, your position is not in the draft. Well, why would it not be in the draft? Yeah, I mean, where the heck is it? It seems like that's the best evidence of what your position is. Here is what I propose. Do you take it or leave it? Well, no, I don't. Here's my counteroffer. Right, and both, I mean, I know that Ms. Faxon-Singer testified that that was the process and I'm sure that I would imagine Ralph did too. Was she without authority to do what she was doing? They said she's a third-year attorney out of law school. They were trying to say, you know, she wasn't really high up here. Was she without authority to act for Chase? No, I mean, there's no evidence that that's the case. In fact, you know, it's the opposite. I mean, she's a licensed attorney. She's on the front line of the negotiations. She's drafting the documents. And the document that finally gets signed was one that was drafted by her and Ralph McKean. That's just, there's no suggestion anywhere in there that she lacked authority. I mean, for the most part, Judge Cohn just wants to ignore what she says and these pejoratives, she's only a woman, she's only a third-year associate, and so on. I hope he didn't say that. I take it back. I'm sorry, I'm sorry, I'm sorry, I'm sorry. I withdraw that. But she's only a third-year associate. It's just a pejorative. She's a partner now, and it's because she's a very smart third-year associate. And the simple truth is that this could have been fixed with a few words. Correct. Some sort of qualification in the guarantee, you know, limited to the extent that period, and then we wouldn't be here and you wouldn't have spent hundreds of thousands of dollars fighting over. Actually millions. Several million. Actually millions. Mr. Washburn, we've asked you a lot of questions. Your initial time has expired, but you'll have your two minutes rebuttal. Okay. I'm going to reserve two minutes and then I'm done. Thank you very much. Sounds good. Good morning. Good morning. John Anding on behalf of Larry Winget and the Larry G. Winget Living Trust. And I'd like to pick up by addressing some of the questions that the court has addressed to fellow counsel. First of all, I want to talk about what the Michigan Supreme Court has said, because we don't need to predict what they will say. They have said it many times and they have said it for many decades. And that is that with respect to Reformation, ambiguity is not required in the language itself. That we are not a state that adopts a textualist view when it comes to Reformation. That extrinsic evidence is, in fact, always permitted in order to understand what the true intent of the parties was behind the language that is contained in the agreement. Of contracts? Of contracts. What's the best case that you have for that? Well, I certainly have a number of cases, Judge. The Goldberg decision is one. Johnson Family Limited is another. And both of those cases deal with the reality that in a context of Reformation that we're entitled to look behind the language to discern the true intent of the parties. In fact, the concept, I know, Judge, in your case, you sat on the Michigan Court of Appeals for many years. In our state, the intent of the parties is paramount. But we're not talking here just about what the parties said in the agreements, although we certainly are doing that. We're also talking about what they did in the period after the agreement was executed. And I'll turn to that, but there are a couple of other things that I think we need to touch on. Before you move on, you look at the term sheet as evidence of what they agreed upon. Yes. When in this negotiation process, in your opinion, did a binding contract come into existence? A binding contract came into existence at the time the Eighth Amendment was executed. At the time they signed it. At the time the Eighth Amendment was executed. Not before. Okay. But the term sheet, of course, is, again, a document that informs what the intent of the parties were heading into the. . . Well, that was before they knew the trust owned some of these assets, right? Because the term sheet doesn't even have the trust in it. That's true. Right. So, I mean, that's a fact that came up later. And, of course, the term sheet is just a page and a half long, and it specifies at the end, of course, that it's not a contract. Judge, we don't. . . I agree with you. We don't need to rely on the term sheet. Let's look at the term sheet. Things changed after the term sheet. I mean, this is kind of like a moving negotiation process. I agree. And that's why, you know, your brief, you kind of lock in on, well, the parties intended this. Look at the term sheet. Well, it continued after that, and it's a moving process. And you just conceded all the way up to the time they actually executed the terms of the Eighth Amendment, and at that point it became a binding contract. Judge, there's no question I conceded that it's a binding contract at the time they executed it. And I want to move past the term sheet because the court's analysis of what the party's intent was was not bound by the term sheet. No, but he used it as evidence. He used it as some evidence, but he also looked at a number of other things that include the file. The Eighth Amendment, of which the guarantee was a part, includes paragraph O, which is at record site 525.3, page 18.485, which recites all of the unlimited guarantees that are being provided in connection with this transaction. The trust is not mentioned. The guarantee itself, in recital B, recites the following, that the guarantee is non-recourse. The guarantee is non-recourse. Non-recourse means that you do not have an unlimited guarantee, but rather you have a limited guarantee. There is no financial statement secured from the trust in connection with this transaction. If they are a guarantor, as the court pointed out and as the bank admitted, federal regulations require securing a financial statement from an unlimited guarantor. None was secured here. No copy of the trust agreement that supposedly is the unlimited guarantor of this transaction is found in the bank's file because they never asked for one. In fact, as the court found, there were no limitations on Mr. Winget's ability to dissolve the trust during the course of the relationship with the bank, which once again points to the fact that the trust in Mr. Winget, in the bank's eyes, were treated as indivisible. Another contemporaneous document, executed at the time the Eighth Amendment was executed, is a document in which an affidavit is provided by Mr. Winget that says that either he or the trust own the assets that are the subject of the pledge. Well, that's kind of interesting because if you're the bank, you want to know who owns what, especially if you have an unlimited guarantor. In other words, all of the contemporaneous signs point to the fact that the trust and Mr. Winget were viewed as indivisible. Non-recourse is, of course, important. That's not what the document says. I mean, he signed it in two different capacities. Did he not? He did, Judge, but he signed a document that says it's a non-recourse guarantee. He signed a document that doesn't... You say they're one entity. I mean, they're separated, the guarantee of him personally and the living trust. I mean, they talk about guarantors, and then he has two different places where he signs. One in his capacity as individual, another capacity as the trust. And I want to be clear because I wasn't sure. There is a single document that he signs in his capacity as guarantor Larry Winget, guarantor Larry Winget Trust, and it's described as a non-recourse guarantee. You can't have it both ways. But these are contemporaneous pieces. Are you now saying the document's ambiguous? Because I thought you conceded it's unambiguous. We had never conceded it. That it provided unlimited liability against the trust. Our position at the district court level was, in connection with its original, we originally maintained that it was unambiguous that it did not provide for an unlimited guarantee. That was our position, and that was in the context of a 12C motion, which the court denied. Judge Cohen ruled it was ambiguous, and that's why we had the trial. Although you didn't deviate from your position as to that it was unambiguous. We never took a contrary position. Judge Cohen found that initially in denying our 12C motion that he thought it was clear that, at least on the face of the language, there's two different obligations being undertaken here. We moved for reformation, and the judge said, I'm going to take a look at the intent. Look at the big picture here. I mean, reformation is an extraordinary, equitable remedy that is out there for really extraordinary circumstances to really right wrongs that legal cases would not do. Does this case fit that situation when you have sophisticated parties, multiple attorneys, and review of everything else, and you don't have a mistake of fact. You have an alleged mistake that a term was put into a contract or not put into a contract. Does this fit really the picture of most of the cases where we'll exercise extraordinary, equitable remedy of doing justice under the circumstances of sophisticated parties and all sorts of attorneys reviewing this? Absolutely, Judge. Why? Well, I'll tell you why. Because every witness that the bank put on the stand was a lawyer. And every lawyer that the judge had an opportunity to view the credibility of, the judge found to be not credible. Now, there was some suggestion. Did he make a finding as to Ms. Singer? Yes. In fact, there are three findings that were made by the court. And let me just put my hands on the... Tell me where he made a finding as to Ms. Singer. He made three findings, Judge. In his opinion, at page 26, he stated, the only support for agent's position is found in the strained testimony from the lawyers for the agent. All of them essentially said that because there was never expressed intention that Section 3 meant anything other than the plain language, the fact that the trust was not included means Winchett's trust was unlimited. This view, which went unexpressed by the agent for years, is not borne up by the evidence. I'm going to come back to that in just a moment. In addition, he found conclusions on the agent's position at page 28. The absence of any credible testimonial evidence from those who negotiated the language of the Eighth Amendment as to the liability of the Winchett Trust, and the absence of any documentary evidence, which would support treating the obligations of the trust, differ from Mr. Winchett's cuts against the agent. The agent cannot simply rely on the plain language of Section 3. That's, by the way, Judge, That is, the Goldberg case is another case that I'd like to bring to the Court's attention. And Goldberg provides. Michigan Supreme Court case, 2008. Michigan courts sitting in equity have long had the power to reform an instrument that does not express the true intent of the parties as a result of fraud, mistake, accident, or surprise. C. Scott v. Burrough, 301 MISH, which is a 1942 case. Again, we have a long history in our state. But there are a number of other considerations that the Court focused on that support reformation in this case. First of all, the post-execution conduct is treated extensively. And I'm not going to focus on the memoranda that are replete in the credit file that all describe this as a limited guarantee. I'm not going to focus on the memoranda that have a section, guarantees, and make no mention of an unlimited guarantee of the trust. I'm not going to talk about that for a moment. What I'd like to talk about is what the lawyers for Chase said to the bankruptcy court. After these documents were executed, they came into the bankruptcy court in an effort to get funds released to them as a secured party and represented to the court that their deficiency would not be covered by the collateral. And what did they say there? They said they held only a limited guarantee of $50 million. Isn't that a judicial estoppel? It certainly is. Wasn't that the end of the discussion? Well, I think it is the end of the discussion. But to the extent that you're asking about equities, that is certainly potentially a fraud in the court. If Chase truly believed that this was an unlimited guarantee, and it represented to the bankruptcy court that it is a $50 million guarantee when it did its math about how much of a deficiency it had in order to get $6 million, that's fraud in the court. So to answer your question, Judge, our jurisdiction is one that has always looked at the intent of the parties behind the contract. But it is certainly one that... In situations like this. In situations like this. Not all the time, but in a situation like this. In situations like this. And let's remember that our jurisdiction is also one that provides that the district court is to be given great deference. The Court of Appeals may not reverse, even though convinced that had it been sitting as a trier of fact, it would have weighed the evidence differently. You may conclude, Judge Griffin, that you wouldn't have reformed this contract. That's not the question before this panel. The question before this panel is whether or not there was sufficient evidence to support the finding that Judge Cohn made, and his opinion, written after an 11-day trial, looking at 117 exhibits, listening to the testimony of every person involved in the negotiation of the guarantee and Eighth Amendment, must be given great deference by this panel. Now... I'm sorry to interrupt your flow, because I know you have several things you want to say, but the opposing counsel said, read his opinion. He never says what the mutual mistake was. The mutual mistake was this. That at the time, this was a non-recourse guarantee. The term sheet says it. The guarantee says it. The Eighth Amendment says it. And they kept saying it even after signing the document. And they kept saying it even after signing the document. The mistake is this. They intended to assure that the substance of the recourse, that is the collateral to which they would get recourse, was available. So they said, let's add the trust, because the trust owns it. And they added the trust to the pledge agreements. And they added the trust to the signature line. Unfortunately, they didn't add it to paragraph three. And that's the mistake. And let's be clear about Dawn Faxon Singer. This is not about casting dispersions. Her testimony was that she did what she was told, that she harbored in her own mind her belief that it made it an unlimited guarantee, that she shared it neither with the lawyers that she worked with, the client, or anyone else. And Judge Cohn found that this unexpressed intention of Dawn Faxon Singer went unarticulated for five years, during which Chase marched out and said it's a limited guarantee when it served its purpose. So this is a case for reformation. Now, I've got a minute to talk about another issue, which we maintain is the issue on which Judge Cohn did error, and an issue on which Judge Cohn did not even address our objections. And that is the issue of whether or not a 363 sale order is final under this court's decision in Waldman and Stern. I want to start by saying this. The error was this. We were barred from proving that the $50 million guarantee would have been repaid by Winget through contribution of outside operating assets of $150 million in the form of South Africa and Australia, which would have resulted in cancellation of the guarantee. And how did that all happen? The Hyundai contract, which is an $800 million contract, which was an asset of the estate, not my testimony, the testimony of a lawyer for Chase who admitted that it was an asset of the estate. It was so much an asset of the estate, this Hyundai contract, that Hyundai actually came into the bankruptcy court and asked for relief from its obligations to perform under the contract. This asset was abandoned under the threat by Chase that if it was not abandoned, it would pull the dip financing, which means the case would become a Chapter 7 and there would be a fire sale. This is not, by the way, my spin on this. The lawyer representing the unsecured creditors at the time that these events transpired said the following. This was Fred Hodera of Akin Gump out of New York. The unsecured creditors expressed their severe disappointment in how the senior lenders prevented the Hyundai contract from occurring. This was a major piece of business, and the record below is very clear that had that major piece of business been secured by the company, Mr. Winget would have contributed his outside assets and by operation of the contribution agreement to which the bank was a third-party beneficiary, the guarantee would have been canceled. We wouldn't be standing here talking about a $50 million guarantee. Was there not a question as to whether this Hyundai contract was even an asset in the bankruptcy case? Or a contract at all? Or even a contract, yeah. Really basically letters of intent? That is not true. That's the argument, but the record support, the testimony of Mr. Nyhan, record 434.3, page 15.304. I'm sorry? Who is he? Mr. Nyhan is a partner of Mr. Washburn, bankruptcy partner at Siddeley Austin. I took his debt. Remember, in connection with this entire portion of the case that dealt with whether or not they'd exercised reasonable care in connection with their enforcement of their security rights, we were given four debts, two hours each, no document discovery. None. Zero. None. What we pieced together was information that was incidentally produced in connection with the unlimited guarantee section of the case where the judge specifically ruled we could not get discovery on the limited liability portion of the case. And what we learned there from Mr. Nyhan in his deposition is that it was an asset of the estate. And as I pointed out, it was so much an asset of the estate that Hyundai, who was bound by it, had to come into bankruptcy court and asked to be relieved of its obligations under it. These were actions, and Mr. Washburn's going to stand up and tell you, well, that's a complaint that's directed at the trustee in venture. Well, Fred Rodera, counsel for the unsecured creditors, didn't believe that. And you know why he didn't believe it? Because it's not true. When the bank came in and said, we'll pull your debt financing and put you into seven if you pursue this opportunity, it was exercising an illegal right. But a legal right in bad faith. Because its objective was to scuttle this company in terms of its ability to have long-term existence, to force Mr. Winget to place South Africa and Australia inside the bankruptcy. Companies worth $150 million. And the record is unrefuted on this. Absolutely unrefuted. I want to be clear about this. Mr. Winget said in an affidavit, and the former executives of venture have stated in affidavits, this was critical to reorganization, and had it been allowed to go forward, Mr. Winget would have contributed the outside assets and this guarantee would have been canceled. Your time has expired. Any other questions? Has this case been through our mediation process? We've attempted to facilitate this case, Judge, but it takes two. So the answer is there's been suggestions of doing that, but it requires that both sides be willing to. Well, in your view, would it be amenable to mediation process or not? Is this the Sixth Circuit mediation process? We went through the Sixth Circuit mediation process, Judge. Oh, you did? Okay. Well, I think we have your arguments in hand. That's all I get? You've gotten twice as much as you had allowed. It's been nine years, Judge. There's an awful lot to say. I may misperceive what really matters here, but it seems to me the only issue is whether or not, and you've already touched on it, there was a sufficient evidentiary basis, particularly in light of his credibility findings, to find that there was clear and satisfactory or clear and convincing evidence that that finding, whether explicit or implicit, and I think he knew that standard, contrary to their view. He cited the case. But was that finding not clearly erroneous? And if you can just tell me why. Persuade me of that. Well, I will tell you why, Judge. I'll tell you apart from the fact that, as you know, as a sitting district court judge, he sat there and saw the witnesses and listened to their testimony. He's entitled to great deference in that regard. But credibility findings quite can't seem to me to be crucial. Well, the credibility finding is crucial, but it doesn't stand alone because the contemporaneous evidence in which the guarantee itself is described as non-recourse, despite their alleging that, in fact, it was recourse as to one and not as to the other,  Maybe you can answer the question. We don't have so much time. Maybe you can answer the question in a minute. Is that possible? I can't. Okay. I apologize, Judge. That's okay. No problem. No, it's a very complicated case. The contemporaneous evidence, including the guarantee itself that describes it as non-recourse, all of the documents that are generated by the bank in an environment where they're seeking to enforce the guarantee, both in front of the bankruptcy court and otherwise, where there's no mention of an unlimited guarantee, but over 100 mentions of only a limited guarantee. The representations to other judicial bodies where, when it served Chase's interests, they described it as a limited $50 million guarantee and not an unlimited guarantee. These are all the pieces that are part on a thread that point clearly in the direction of the inequity of enforcing a guarantee that would effectively destroy my client. A $750 million judgment would ruin him. And this decision by the court is defensible under the standards that are articulated by the Michigan Supreme Court, including our own Supreme Court, Anderson v. Bessemer, 470 U.S. 564, which talks about the deference that's to be given to a trial bench in a situation like this. Thank you, Judge. Okay. Thank you, Mr. Andy. Good morning, Your Honor. Good morning. I'm Todd Mandel. I'm here just for Cross Appellee William Burgess, who was singled out. There's only one issue in this appeal relating to Mr. Burgess. Did the district court abuse its discretion when it denied any sanctions against him under 28 U.S.C. 1927? The answer is no. He did not abuse his discretion. As has been commented on, the district court lived with the case for many years, made many rulings, heard a lot of testimony and evidence. As it relates to Mr. Burgess, the district court himself, Judge Cohn himself, said the assertion of misconduct against Mr. Burgess nowhere comes close to sanctionable conduct. The defendants failed to establish any misconduct on the part of Mr. Burgess, and Mr. Burgess was neither unreasonable nor vexatious. These are highlights on pages 8 to 12 of our brief. We gave a lot more elaboration. Secondly, the facts, as viewed through the lens of Chase and Burgess, and the law on reformation, which has a clear and convincing standard, we've detailed it extensively in our briefs, show that it favored Chase. And thirdly, the case law on 28 U.S.C. 1927. Again, we've really, I think, tried to elaborate and give the court a sense of what types of cases. It's a very, very high standard that a district judge has to reach. He's satisfied it has been reached, was not reached, and therefore his decision should be upheld. The right decision is a fair decision. Under all the circumstances, to single him out, go against him, the judge, as you say, knew the case, the judge reached his conclusion, and it's also a finding of fact, isn't it? It has to be clearly erroneous. As to Mr. Burgess, exactly what you said, Judge Carter, that's precisely the case. We've elaborated it. I'm not going to repeat or go through any of the cases here. I think we've tried to give you an idea of here's the types of things in cases where sanctions have been awarded. So I'm just going to conclude. The motion for sanctions against Mr. Burgess was properly denied by the district court. The district court did not abuse its discretion in making that decision. There is no reason whatsoever for this court to reverse or to disturb Judge Cohen's finding. Thank you. Thank you, Mr. Mendell. Mr. Washburn. Your Honors, I'd first like to start by talking about the Stern v. Marshall case. I'm sorry, but I'd like you to answer, and then I'll try to keep going. Please let me come back to this. The question that I raised first was the defendant's description of the statements made in the bankruptcy proceeding by lawyers representing the bank, particularly with regard to the nature of this guarantee. Has the defendant accurately portrayed those statements? And if so, why aren't you judicially stopped from now telling us something different? Or aren't you telling us something different? The only one that I think he recalled that he talked about was Larry Nyhan's statement to the court. What Larry was talking about was the amount that we can recover, that we're certain to recover, if we execute on all the collateral. And this also explains all those 100 internal memos, which is really one memo rewritten 100 times. But the notion always was when the bankruptcy lawyers and when the bankers were looking at the collateral that was available under the guarantee, they looked at the pledges, because pledged collateral is collateral. And they testified to this. All of them testified to this, and their testimony is cited in our briefs. I'm not sure if Larry testified, but certainly all the others who wrote the memos about a $50 million guarantee and a limited guarantee. They all said, bear in mind, this is like a sentence. This isn't intended to be a thorough examination of all the rights of the parties under the guarantee. It's just at the end of the day, if you have to execute on the collateral, what are you going to get? Well, you've got a guarantee. The guarantee is there's an unlimited full recourse guarantee, but you don't know what the trust owns. What you have is pledge. You have a pledge of the assets, and that pledge can be canceled for $50 million. So the most conservative statement of what they could recover was $50 million, and that's what they always use. And especially when Mr. Nyhan is coming to the court and saying, you know, there's certain money that's being held in reserve. You're not going to give it to us. We'd like to have it because we think there's going to be a deficiency at the end of the day. And when we add up the collateral that we actually have that we can act against and collect on, we're certain that we can get $50 million from the Pledge of South Africa and Australia. That's why he said that. And that's, as I say, the testimony said in our briefs. To go back to the words have meaning, maybe why he said it, maybe what he intended, but what the bankruptcy court was told and heard. Well, you have to look at it in context. The question before the bankruptcy court was not, what's this guarantee all about? The question before the bankruptcy court was not the question before Judge Cohen. The question before the bankruptcy court was, you say that you're going to have a deficiency. Even after you liquidate all your collateral, you're going to have a deficiency. Larry Nyhan says, yes, we are. And counting down the collateral and saying, this is what we can get from this and this is what we can get from that. I come to the winter guarantee. It's secured by a pledge. The pledge is worth $50 million. You have to understand. And, again, this was in the context of argument and a presentation to the court. And everybody in that room understood the context and understood what the purpose of that testimony was. And in those circumstances, the $50 million was the right number. And in all the memos that were written, those memos were about, okay, if everything goes wrong here, if the company isn't reorganized, what can we collect on? When they came down to the winter guarantee, they would say $50 million because that's what the pledge is worth. And we have pledged collateral. We know what that is. And there's this five-year period where, according to my understanding, there's silence about, hey, by the way, we have this unlimited guarantee. Why doesn't that come into the picture much earlier? And even in the bankruptcy proceedings. A clarification in terms. The guarantee is unlimited as to both Mr. Winget and the trust. That is, they guarantee the full amount of the debt. What's limited as to Mr. Winget is recourse. Yeah, just to be clear. Did Judge Cohen decide this case on the basis of judicial estoppel? No. No, it was never. No. Did they appeal that issue? No, they did not. Okay. I know this evidence came in, but it went to the intent of the parties. Correct. Right. Agreed. Agreed. Judicial estoppel was never asserted. Yeah, okay. Really, that should have been the answer. I know you have another point. Okay, I do have one point. And this, to me, is very important. Because so many, really all of their arguments depend in one way or another on the fact that they were denied the ability to go back and look into whether Chase made reasonable efforts to collect on the collateral. All this business about Hyundai and all the other things, that's what they want to look at. They were denied the opportunity to check our reasonable efforts to liquidate the collateral. And all of our efforts to collect on the collateral were made in the bankruptcy court. That is, every last bit of collateral was liquidated either by the debtor in possession or subsequently by the bankruptcy trustee. All Chase ever did was take the money. That's all we ever did. And the Stern v. Marshall case, which they set repeatedly, we've made arguments in our brief, which I'm sure you've read, about why that doesn't say that decisions that the bankruptcy court makes on core issues like the value of collateral, decisions like that, when it's a final decision, it's raised judicata as to any other claim that's raised on the same facts. So they can't come, since Mr. Windsor was always a party to bankruptcy, he can't come back later. I mean, that's basic bankruptcy law. And, happily, this court, this year, dealt with this situation as it applies to Stern v. Marshall. That is, Mr. Anding is not the only person who picked up Stern v. Marshall and thought that he had an argument like this. And I'd like to direct the court's attention to, in Ray Hart, 564 Federal Appendix 773, 6th Circuit, 2014. Let me repeat that. In Ray Hart. I'm sure your crooks have already found this, but in case they haven't. In Ray Hart, 564 Federal Appendix 773, makes exactly the same arguments that we do in our brief and comes to exactly the conclusion that we say to be reached on that issue. Stern simply does not preclude raised judicata where we have final bankruptcy orders as to every one of these pieces of collateral where Mr. Windsor was a party to those who had the interest and the opportunity and, in the case of the biggest chunk, did, in fact, object to the final order and withdrew those objections. Okay. Thank you, Mr. Washburn. Thank you. Did you have any further time? I just had a citation, Judge, in light of the comments that were just made. Okay. It's the court's opinion. I'd ask the court to look at factual findings 43, 44, and 45 that also include other judicial statements made. Okay. Great. Well, thank you very much. It's a complicated case that we've used the first hour of today's proceedings, but that was necessary. We do have other parties here who have cases to be argued today, so we must proceed. But thank you very much for your arguments. We very much appreciate them. The case will be submitted.